IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WAYNE COOMBS, | : | |
|     Petitioner, | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 04-1841 |
| DAVID DIGUGLIELMO, et al., | : | |
|     Respondents. | : | |

## MEMORANDUM OPINION

**RUFE, J.**                                                                                                                        **DECEMBER 14, 2012**

Before the Court are Petitioner Wayne Coombs's Objections to the Report and Recommendation filed by United States Magistrate Judge Thomas J. Reuter ("R&R"). Petitioner asserts that Judge Reuter erred in his conclusion regarding the ultimate issue in this case—whether the prosecutor's use of preemptory strikes during jury selection in Petitioner's underlying criminal trial violated the Equal Protection Clause. According to Petitioner, he has met his burden to show that it is more likely than not the prosecutor struck at least one juror because of race as proscribed by the Supreme Court in <u>Batson v. Kentucky</u>.[1] For the reasons that follow, the Court agrees. Accordingly, the Court will sustain Petitioner's Objections and grant the Petition.

### I. BACKGROUND

A.     STATE COURT PROCEEDINGS

On February 22, 2000, Petitioner, a Black man, was arrested for a series of robberies which took place in Philadelphia from the fall of 1999 through the winter of 2000. Petitioner's first trial for charges relating to these robberies commenced in September 2001 in the Philadelphia County Court of Common Pleas; the trial ended in a hung jury.

---

[1] 476 U.S. 79 (1986).

Petitioner was re-tried in November 2001. On November 26, 2001, during the first day of jury selection, the prosecutor assigned to the case, Max Kramer, raised a "reverse Batson"[2] challenge based on defense counsel's use of preemptory strikes to exclude three White jurors.[3] Defense counsel, Jerome Mallon, responded to the prosecutor's challenge by explaining that: (1) he struck Juror No. 35 because she stated she would be more likely to believe the testimony of a police officer in light of his or her job, and had two friends who had been abducted from the street; (2) he struck Juror No. 8 because she was friends with and related to several active and retired police officers and was married to a firefighter; and (3) he struck Juror No. 21 given her relation to and inclination to believe police officers and her statement that she would have difficulty following the instruction that a defendant's choice not to take the stand or present evidence could not be held against him, and in light of her experience working at a bank that had been robbed.[4]

Defense counsel then raised a Batson challenge based on the prosecutor's use of two preemptory strikes against two Black women, stating "the last jury hung because of a [B]lack female. Today we had two [B]lack females. Both of them have been stricken for no good reasons [sic]."[5] The prosecutor stated that he believed defense counsel was just retaliating for the prosecutor's reverse Batson challenge, and explained that he struck Juror No. 14 because her brother was charged with robbery fifteen years ago and she initially stated she was less likely to

---

[2] A defendant's claim that a prosecutor violated the Equal Protection Clause by exercising a preemptory strike to exclude an individual from jury service on account of the individual's race is commonly referred to as a "Batson challenge," so named for the case in which such claims were first recognized by the Supreme Court, Batson v. Kentucky, 476 U.S. 79 (1986). Batson challenges historically concern the use of preemptory strikes by the prosecutor; where a challenge is made based on defense counsel's exclusion of *venire* persons such claims are commonly referred to as "reverse Batson" challenges.

[3] 11/26/2001 Trial Tr. (Pet'r's Ex. 1) 55.

[4] 11/26/2001 Trial Tr. 56-59.

[5] 11/26/2001 Trial Tr. 60.

believe a police officer, and that he struck Juror No. 19 because she was an eye witnesses to a shooting and her mother was robbed a long time ago.[6]

The Honorable Gary S. Glazer, who presided over the trial, denied both challenges stating:

> These are what lawyers do with peremptory challenges. They're not race-based. . . . As long as we have peremptory challenges, lawyers are going to make judgments maybe based on hunches, maybe based on prior experiences, maybe based on feelings, but they're not based on race. Both of you are much too good lawyers to do something like that.[7]

At the conclusion of jury selection on November 27, 2001, defense counsel raised a second Batson challenge, this time challenging the prosecutor's use of five of his six preemptory strikes to exclude Black individuals from the jury.[8] Before affording the prosecutor an opportunity to offer a racially-neutral explanation, the trial judge stated: "I'm not finding there's another pattern. I'm trying to save time so we can get to the merits of the case."[9] He then asked that the prosecutor put his reasons for striking the three jurors not previously discussed on the record. With respect to Juror No. 22, a Black woman, the prosecutor stated:

> [S]he said that her cousin had been an eyewitness to an armed robbery. Since there weren't many questions about that, I kind of had doubts about any time there's family members who are witnesses to armed robbery. I don't know if they were involved in it, and she wasn't saying that, if there was and she was an actual independent witness who saw an armed robbery happen. For that reason, I used my peremptory challenge.[10]

The prosecutor then explained that he struck Juror No. 4 because "she had a nephew who was shot this summer. She had a nephew in jail awaiting charges on gun charges. Her sister was

---

[6] 11/26/2001 Trial Tr. 60-61.

[7] 11/26/2001 Trial Tr. 62.

[8] 11/27/2001 Trial Tr. (Pet'r's Ex. 2) 72.

[9] 11/27/2001 Trial Tr. 73.

[10] 11/27/2001 Trial Tr. 73-74.

an eyewitness to crime. And she was friends with a defense attorney who everyone knew at one point."[11] Defense counsel then referred the prosecutor to Juror No. 1, a Black man; the prosecutor stated in response:

> "I just don't like him, Your Honor, I don't really have a sound reason. . . . I don't know, just the way he was looking at me. . . . I mean I just didn't like him and he didn't check off many boxes, but I went with my hunch . . . ."[12]

The trial judge responded: "Okay. All right. Let's go. Are we ready to start?"[13] Defense counsel asked: "Your Honor is going to accept the Commonwealth's assertions and deny my motion?"[14] The trial judge answered simply, "Yes."[15]

On November 30, 2001, a jury, consisting of nine White and three Black jurors,[16] convicted Petitioner of nine counts of robbery and three counts of possessing an instrument of a crime. Sentencing was set for February 13, 2002. At sentencing, defense counsel again raised the Batson issue.[17] He attempted to introduce evidence of two conversations he had with the prosecutor, one between the end of the first trial and the beginning of the second and the other just before sentencing, which he claimed was relevant to the use of preemptory strikes.[18] Before defense counsel could explain his argument or the nature of the evidence, the prosecutor interjected:

---

[11] 11/27/2001 Trial Tr. 74.

[12] 11/27/2001 Trial Tr. 75.

[13] Id.

[14] Id.

[15] Id.

[16] See R&R at n.1; Pet'r's Ex. 6.

[17] 2/13/2002 Sentencing Tr. (Pet'r's Ex. 3) 3.

[18] 2/13/2002 Sentencing Tr. 7.

4

> MR. KRAMER: Your Honor, I object to this because I don't think this information should be before the Court. It's complete hearsay. And there is no way for Mr. Mallon to even confirm this information, other than to call that juror that he's going to speak about. And it's completely irrelevant, Your Honor, to the trial that took place the second time around. I don't think that it should be made part of the record. It was a conversation I had with Mr. Mallon.
> THE COURT: Does it involve external influence on the juror?
> MR. KRAMER: No.
> THE COURT: Well, then it's not relevant.[19]

Defense counsel then sought to interject:

> MR. MALLON: Well –
> THE COURT: I don't want to get into it.
> MR. MALLON: It involved his state of mind with respect to race.
> THE COURT: It's irrelevant.
> MR. MALLON: Well –
> THE COURT: It's irrelevant.
> MR. MALLON: Can I make an offer of proof as to what it is?
> THE COURT: No. No. It's hearsay.
> MR. MALLON: It's not hearsay. I'm offering it for his state –
> THE COURT: Who's state of mind?
> MR. MALLON: Mr. Kramer's state of mind.
> THE COURT: It's not relevant as to anything.
> MR. MALLON: It's relevant to his exercise of preemptory challenges. . . .
> THE COURT: You can submit an affidavit.[20]

Judge Glazer dismissed Petitioner's argument regarding the Batson challenge and sentenced Petitioner to 59 to 160 years imprisonment.

Less than a week after sentencing, Defense counsel submitted an affidavit concerning his conversations with the prosecutor. In the affidavit, defense counsel stated that he had a conversation with the prosecutor between the first and second trial during which the prosecutor told him that a juror from the first trial, who had called the prosecutor, informed the prosecutor that there had only been one "holdout" juror at the first trial, and that this juror was a Black woman. Defense counsel also attested that he had a second conversation with the prosecutor

---

[19] 2/13/2002 Sentencing Tr. 7-8.

[20] 2/13/2002 Sentencing Tr. 8-9.

after the second trial concluded but before sentencing; according to defense counsel, during this conversation the prosecutor said that the Black woman juror from the first trial "had voted not guilty because the defendant was [B]lack and she was [B]lack."[21] The substance of the affidavit did not change Judge Glazer's opinion with respect to the Batson issue; Petitioner's post-sentence motions were denied.[22]

Petitioner thereafter filed a direct appeal to the Pennsylvania Superior Court, raising a Batson challenge among other claims. The Superior Court denied Petitioner's claims without reaching the merits of the appeal, holding that Petitioner's claims were waived under Commonwealth v. Spence,[23] because Petitioner failed to make a record for review. The Pennsylvania Supreme Court denied Petitioner leave to appeal to that court. Petitioner then filed the Petition for Writ of Habeas Corpus, pursuant to 28 U.S.C. § 2254, in this Court.[24]

B.   INITIAL FEDERAL REVIEW

In his habeas petition, Petitioner again raised a Batson challenge to the prosecutor's exercise of preemptory strikes in his second trial. The Court referred the Petition to the Honorable Thomas J. Reuter for a Report and Recommendation ("R&R") pursuant to Local Civil

---

[21] Mallon Aff. (Pet'r's Ex. 4); see also Coombs v. Diguglielmo, 616 F.3d 255, 259 (3d Cir. 2010).

[22] Commonwealth v. Coombs, No. 954 EDA 2001, slip op. at 4 (Pa. Super. Ct. July 21, 2003).

[23] 627 A.2d 1176 (Pa. 1993). As the Third Circuit explained, "[t]he Spence rule requires an appellant raising a Batson challenge 'to make a record identifying the race of venirepersons stricken by the Commonwealth, the race of prospective jurors acceptable to the Commonwealth but stricken by the defense, and the racial composition of the final jury selected.'" Coombs v. Diguglielmo, 616 F.3d 255, 260 n.2 (3d Cir. 2010) (quoting Commonwealth v. Holloway, 739 A.2d 1039, 1045 (1999) (internal quotations omitted)). Petitioner was, in effect, foreclosed from creating such a record in this case because the trial judge prevented him from introducing evidence or argument on the issue. See, e.g., 2/13/2002 Sentencing Tr. 8-9.

[24] Petitioner did not seek state collateral review before filing the Petition. However, exhaustion was not an issue on appeal because Petitioner's claims were deemed procedurally defaulted under state law, which is an exception to exhaustion under 28 U.S.C. § 2254 (b)(1). See Whitney v. Horn, 280 F.3d 240, 250 (3d Cir. 2002) (citing 28 U.S.C. § 2254 (b)(1) for the proposition that exhaustion of state remedies requires that Petitioner fairly present all federal claims to the highest state court, but that where the claims are procedurally barred, exhaustion is waived in the federal habeas court).

Rule 72.1 and 28 U.S.C. § 636(b)(1)(B). Applying the deferential standard of review set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),[25] Magistrate Judge Reuter found that Petitioner had failed to demonstrate that the trial court's decision was contrary to or an unreasonable application of Batson, and recommended that the Petition be denied.[26] This Court approved and adopted Magistrate Judge Reuter's recommendation and denied the Petition. The Third Circuit granted Petitioner a Certificate of Appealability of the Batson issue.

C.   THIRD CIRCUIT OPINION

The Third Circuit held in a precedential opinion that "when, although properly preserved by the defendant, the state court has not reached the merits of a claim thereafter presented to a federal habeas court, the deferential standards provided by ADEPA . . . do not apply."[27] The Third Circuit instructed that because the state courts never considered the merits of Petitioner's Batson claim, this Court should review the claim *de novo*.

Supreme Court precedent requires that a trial judge engage in a three-step analysis when a Batson challenge is raised:

> "First, the defendant must make out a *prima facie* case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.' Second, once the defendant has made out a *prima facie* case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes. Third, 'if a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination.'"[28]

---

[25] 28 U.S.C. § 2254(d).

[26] R&R (Doc. No. 16) at 4.

[27] Coombs, 616 F.3d at 260 (internal quotations omitted).

[28] United States v. Rodriguez, 178 F. App'x 152, 155 (3d Cir. 2006) (quoting Johnson v. California, 545 U.S. 162, 168 (2005)) (internal citations and quotation marks omitted) (alteration in original).

7

In Petitioner's case, the Third Circuit held that "the trial court failed to conduct a full and complete Batson step three analysis . . . by unreasonably limiting the defendant's opportunity to prove that the prosecutor's proffered reasons for striking Black jurors were pretextual, thereby improperly restricting the defendant's ability to provide discriminatory intent."[29] According to the Third Circuit, the trial court "appears to have dismissed Coombs'[s] Batson claim because it believed the defense attorney and the prosecutor were 'much too good lawyers to do something like that.'"[30]

The Third Circuit was most "trouble[ed]" by the trial court's failure to examine "the prosecutor's statements that he struck Juror No. 1 because he 'just didn't like' the juror and because the juror was giving him 'bad looks.'"[31] The Third Circuit described the prosecutor's explanation of his strike of Juror No. 1 as "vague and elusive" and further explained:

> Like anyone else, trial attorneys possess those human frailties that make each of us far too susceptible to social conditioning and the subliminal bias that may result. Thus, although we do not suggest this happened here, we are reminded of Justice Marshall's observation in Batson that "[an attorney's] own conscious or unconscious racism may lead him easily to the conclusion that a prospective black juror is 'sullen,' or 'distant,' a characterization that would not have come to his mind if a white juror had acted identically." Accordingly, "outright prevarication by [attorneys is not] the only danger . . . . It is even possible that an attorney may lie to himself in an effort to convince himself that his motives are legal." Although we again stress that we are not suggesting what this prosecutor's motivation was, trial court's [sic] must be particularly vigilant when Black jurors are struck because an attorney is acting on a "hunch."
>
> This means that a trial court must be exceedingly careful about rejecting a Batson challenge merely because the prosecutor explains that s/he did not like the way a juror looked at her/him. Although counsel's discomfort with real or perceived "looks" from a prospective juror may arise from factors that would readily survive a Batson challenge after an appropriate inquiry, Justice

---

[29] Coombs, 616 F.3d at 263.

[30] Id.

[31] Id.

8

Marshall's admonition in Batson cautions that such discomfort may not similarly arise if a White juror looks at counsel the same way. Therefore, courts should not allow nebulous expressions of discomfort to justify striking a juror. Batson requires an appropriately tailored inquiry, an opportunity for opposing counsel to argue that the proffered reasons are pretextual, and a finding by the trial court. If it were otherwise–and an unexamined explanation were allowed to survive a Batson challenge, Batson inquires would quickly be reduced to a meaningless procedural ritual.

We realize that it may be uncomfortable and unpleasant for a trial judge to undertake such a difficult and subtle inquiry with the precision and persistence that may be required to determine counsel's true reasons for striking a juror. No judge wants to be in the position of suggesting that a fellow professional—whom the judge may have known for years—is exercising peremptory challenges based on forbidden racial considerations. However, we also realize that if Batson is to be given its full effect, trial courts must make precise and difficult inquiries to determine if the proffered reasons for a peremptory strike are the race-neutral reasons they purport to be, or if they are merely a pretext for that which Batson forbids.

Nor is it relevant that the prosecutor appears to have offered race-neutral explanations for all but one peremptory challenge. "[A] prosecutor's purposeful discrimination in excluding even a single juror on account of race cannot be tolerated as consistent with the guarantee of equal protection under the law." Although we are not suggesting that the district court should only consider the prosecutor's strike of Juror No. 1 on remand, we do note that if Juror No. 1, and only Juror No. 1, was struck because of his race, then the Batson challenge should have been sustained.[32]

The Third Circuit remanded the case to this Court to conduct a hearing consistent with the Opinion, explaining that this Court's fact-finding should include consideration of the evidence concerning the alleged conversations between the prosecutor and defense counsel during which the prosecutor was alleged to have revealed knowledge of what occurred during jury deliberations for the first trial.[33]

---

[32] Coombs, 616 F.3d at 264-65 (internal citations omitted).

[33] Id. at 265.

D.   EVIDENTIARY HEARING

Upon remand from the Third Circuit, this Court referred the case to Magistrate Judge Reuter to conduct an evidentiary hearing and to prepare a revised R&R. On April 26, 2011, an evidentiary hearing was held. Defendant's trial counsel, Mr. Mallon, and the prosecutor, Mr. Kramer, testified. The evidentiary hearing produced little new evidence. The prosecutor had no independent recollection of his reasons for using his preemptory strikes, and while he asserted that review of state trial court transcript "refreshed" his recollection, he was unable to remember anything beyond the content of such transcripts and was unable to expand upon the explanation he provided therein. At the hearing, however, Petitioner produced additional evidence about defense counsel's two conversations with the prosecutor regarding jury deliberations in the first trial and created a record of the characteristics of the jury panel from the second trial.

1.   Conversations between Defense Counsel and the Prosecutor.

Consistent with the Affidavit submitted after Petitioner's sentencing, defense counsel testified that he had two conversations with the prosecutor about the jury deliberations in the first trial. The first conversation occurred between Petitioner's first and second trial. During this conversation, the prosecutor informed defense counsel that he had been contacted by a juror from the first trial and that the juror had informed the prosecutor that most of the "votes" for the robbery counts had been 11 to 1 for conviction with the hold-out juror being a Black woman.[34] The day before sentencing, counsel again had a conversation about jury deliberations in the first trial; the prosecutor told defense counsel that the "hold-out" Black woman juror had refused to

---

[34] 4/26/2011 Hr'g Tr. 16.

vote guilty simply because she was Black and Petitioner was Black.[35] Defense counsel testified that the prosecutor told him this information in an attempt to induce Petitioner to plead guilty.[36]

The prosecutor could not recall the conversations with defense counsel and initially stated that he did not recall whether he had a conversation with a juror from the first trial; however, after additional questioning, he specifically denied having a conversation with a juror from the first trial.[37] He suggested that he may have received the information regarding juror votes from a member of the trial court's staff who simply may have overheard the jury's deliberations in the first trial and passed it on to him.[38] The prosecutor explained that he did not believe the race of the jurors was the cause of the hung jury; rather, he thought that there was a hung jury in the first trial because the jury was presented with too much evidence due to his decision to prosecute on behalf of 12 victims.[39] When he retried the case, he reduced that to three sets of victims.[40]

Counsel for Petitioner introduced the prosecutor's notes taken at some point after the first trial. These notes, which were authenticated by the prosecutor, list the way the jury voted as to four different robberies tried during the first trial, and contain other short phrases such as "L or R hand with gun," "color of jacket," and "foreperson Anti-police."[41] Below a note recording a vote of eight to four for the Coleman burglary, is the phrase "racial lines."[42] The prosecutor was

---

[35] 4/26/2011 Hr'g Tr. 17.

[36] 4/26/2011 Hr'g Tr. 25.

[37] 4/26/2011 Hr'g Tr. 78-79, 84.

[38] 4/26/2011 Hr'g Tr. 99-100.

[39] 4/26/2011 Hr'g Tr. 36.

[40] 4/26/2011 Hr'g Tr. 36.

[41] Pet'r's Ex. 5.

[42] Id.

unable to give context for the notes and testified that although he could say that the notes were written by his hand, he had no recollection of taking the notes.[43]

2. <u>Composition of the Jury Panel and Final Jury</u>

The jury panel from which the jury in Petitioner's second trial was selected consisted of 27 individuals, nine of whom were Black (33%) and 18 of whom were White (67%).[44] The prosecutor exercised six of his seven preemptory strikes and of the six he used, five were used on Black *venire* persons. In statistical terms, the prosecutor used 83% of his strikes to strike Black *venire* persons. The final jury included three Black (25%) and nine White (75%) jurors.

E. THE R&R AND PETITIONER'S OBJECTIONS

After holding a hearing, Magistrate Judge Reuter issued an R&R containing detailed findings of fact and recommending that the Petition for writ of habeas corpus be denied.[45] The Magistrate focused his analysis on step three of the <u>Batson</u> inquiry as directed by the Third Circuit. Relying primarily on the testimony of the prosecutor, which he found credible, the Magistrate found that the prosecutor did not exercise any of his preemptory strikes in violation of the Equal Protection Clause.

Petitioner has filed counseled Objections to the R&R. He does not object to the conclusion with respect to the prosecutor's motive for striking Jurors Nos. 4, 14, 19 and 22,[46] but asserts that he has met his burden to show that it is more likely than not that the prosecutor struck Juror No. 1 because of that juror's race.[47]

---

[43] 4/26/2011 Hr'g Tr. 100.

[44] Pet'r's Exs. 6, 7.

[45] Doc. No. 46.

[46] The Court approves and adopts the R&R with respect to the conclusions regarding these Jurors.

12

## II. STANDARD OF REVIEW

As stated above, the Third Circuit has instructed that because the state court did not reach the merits of Petitioner's Batson claim, this Court should review the claim *de novo*.[48] In addition, where a habeas petition, such as the one in this case, is referred to a magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1), a district court judge conducts a *de novo* review "of those portions of the report or specified proposed findings or recommendations to which objection is made" and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."[49] Petitioner objects to Magistrate Judge Reuter's conclusion with respect to Juror No. 1. Accordingly, the Court conducts a *de novo* review of the R&R's conclusions regarding Juror No. 1 only.[50] Additionally, the Court defers to Magistrate Judge Reuter's factual findings to the extent they are based on the credibility of the witnesses.[51]

## III. DISCUSSION

As stated, Batson challenges are evaluated pursuant to a three-step framework.[52] The Court begins its analysis at step three as directed by the Third Circuit.[53] Step three requires that

---

[47] Doc. No. 49.

[48] Coombs, 616 F.3d at 261.

[49] 28 U.S.C. § 636(b)(1)(C).

[50] Although the Court limits its analysis to a discussion of the prosecutor's reasons for striking Juror No. 1, the Court has considered all evidence as it relates to the prosecutor's striking of the other four Black *venire* persons and agrees with Magistrate Judge Reuter that Petitioner has failed to prove that the reasons given for striking these jurors was pretextual. However, the Court considers these strikes as relevant in determining whether the reason given for striking Juror No. 1 was a pretext.

[51] Hill v. Beyer, 62 F.3d 464, 482 (3d Cir. 1995).

[52] Rodriguez, 178 F. App'x at 155-56.

[53] See Coombs v. Diguglielmo, 616 F.3d 255 (3d Cir. 2010); see also Respondent's Post Hearing Response to Petition for Writ of Habeas Corpus (Doc. No. 44) at 16. To the extent there is a question regarding the prosecutor's ability, at step two, to offer a race-neutral reason for striking the male juror, the Court finds that the

the Court determine whether the race-neutral reason given by the prosecutor is merely a pretext for a discriminatory motive.[54] This step is based on "the fundamental principle that 'official action will not be held unconstitutional solely because it results in a racially disproportionate impact. . . . Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.'"[55] "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."[56]

At step three it is the petitioner's burden to show that "it is more likely than not that the prosecutor struck at least one juror because of race."[57] "To determine whether the petitioner has carried his or her burden, the court must evaluate all evidence introduced by each side (including all evidence introduced in the first and second steps) that tends to show that race was or was not the real reason for each strike. Step three ultimately focuses upon the prosecutor's subjective motivation, which ideally includes an assessment of the demeanor and credibility of the various voir dire participants."[58]

---

prosecutor has met his burden. "A neutral explanation in the context of [a court's] analysis [at step two] means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360 (1991). As Defendant concedes, the prosecutor's explanation on its face is not discriminatory. Petitioner's Proposed Findings of Fact and Conclusions of Law (Doc. No. 43) ¶ 39. The question here is whether the proffered reason is merely a pretext for a discriminatory motive, which the Court explores at step three of the Batson inquiry.

[54] Rodriguez, 178 F. App'x at 155-56.

[55] Hernandez, 500 U.S. at 359-60 (quoting Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 264-65 (1977)).

[56] Id. at 360 (quoting Personnel Adm'r of Mass. v. Feeney, 442 U.S. 256, 279 (1979)).

[57] Williams v. Beard, 637 F.3d 195, 215 (3d Cir. 2011) (quoting Bond v. Beard, 539 F.3d 256, 264 (3d Cir. 2008)).

[58] Id. at 215-16 (internal quotation marks and citations omitted).

14

A. THE FINDINGS CONTAINED IN THE R&R

The R&R relied heavily on his assessment of the credibility of the prosecutor in his step three analysis, finding the prosecutor credible based on his observation of the prosecutor's demeanor, "the fervency with which [he] testified," and the prosecutor's statements about the 17 years he has practiced law, during which time he has never been "accused of doing anything remotely unethical."[59] The R&R characterized the prosecutor's testimony regarding Juror No. 1 as "reiterating" the justifications he had given before the trial judge.[60] However, the prosecutor did not have any independent recollection of his reasons for striking Juror No. 1; he instead relied on his statements in the trial transcript.[61] Although the prosecutor could not remember why he struck Juror No. 1, he testified that it was not his "practice to use a [*venire*] person's race as a factor in deciding whether to exercise a preemptory challenge."[62] He stated that it was his practice to take a *venire* person's demeanor into account, a process which would include consideration of the way the prospective juror "looked" at the prosecutor and the prospective juror's body language.[63] Again, the prosecutor was unable to recall what specific characteristics of Juror No. 1, such as his body language or eye contact, he "didn't like."[64]

The Magistrate also heard testimony regarding the conversations between the prosecutor and defense counsel, and considered the prosecutor's notes regarding jury deliberations in the

---

[59] R&R ¶¶ 22-23.

[60] Id.

[61] 4/26/2011 Hr'g Tr. 55-56.

[62] 4/26/2011 Hr'g Tr. 31.

[63] 4/26/2011 Hr'g Tr. 32.

[64] 4/26/2011 Hr'g Tr. 55; 11/27/2001 Trial Tr. 75.

15

first trial. He found that based on the limited information the notes provided the prosecutor "would have no basis to assume that in a second trial [Black] jurors would be incapable of rendering a fair and impartial verdict," and therefore concluded that the notes do not substantiate the suggestion that the prosecutor thought race was relevant in selecting the jury.[65] The R&R concluded that statistical analysis supports the prosecutor's testimony because 25% of the jury was Black which "roughly corresponds to the make-up of the available jury pool, which was comprised of [sic] thirty percent (30%) African-Americans."[66]

Finally, the Magistrate Judge explored side-by-side comparisons of Black *venire* persons who were struck and White *venire* persons who were allowed to serve.[67] Specifically, he considered five White *venire* persons who were not excluded by the prosecutor and who Petitioner identified at the hearing as comparators to the four Black women who were struck.[68] The R&R did not identify a comparator as to Juror No. 1 who gave few affirmative answers on the jury questionnaire.

B.     THIS COURT'S ANALYSIS

While the Court recognizes that the credibility and demeanor of the prosecutor may be the "best evidence" of discriminatory intent,[69] the Court finds that the prosecutor's credibility here does not provide sufficient basis to disregard the totality of the circumstances which require a finding of discriminatory intent. Accepting the Magistrate Judge's assessment of the

---

[65] R&R ¶ 31.

[66] R&R ¶¶ 32-33.

[67] R&R ¶ 34.

[68] R&R ¶¶ 35-39.

[69] Id. at 216

16

prosecutor's credibility, as this Court is required to do,[70] the prosecutor's credible testimony supports only a finding that he subjectively believes he did not and would not strike a juror because of the juror's race. The testimony does not and cannot establish that race was not a factor because the prosecutor did not at the hearing independently remember his reasons for striking Juror No. 1.

When the trial judge gave the prosecutor the opportunity to explain his reasons for striking Juror No. 1, the prosecutor stated: "I just don't like him, Your Honor, I don't really have a sound reason. . . . I don't know, just the way he was looking at me. . . . I mean I just didn't like him and he didn't check off many boxes, but I went with my hunch . . . ."[71] When given the same opportunity at the April 26 hearing, Mr. Kramer testified that he had no independent recollection of why he struck Juror No. 1.[72] After reviewing his statement to the trial judge, he stated: "I told the Judge I just didn't get a good vibe from him. It was my hunch that I was going on and it was just something about him himself [sic] that I decided to strike him."[73] As the Third Circuit noted, the prosecutor's stated reasons at trial for striking Juror No. 1 were "vague and elusive," and his testimony at the hearing did nothing to clarify his reasons for striking Juror No. 1. Despite his credible assurances that he would not consider race in striking a juror, he is unable to testify as to why he struck Juror No. 1 beyond what he stated before the trial judge. Thus, although the Court accepts the finding that the prosecutor testified credibly at the hearing, the testimony is of little aid to the Court's analysis in this case.

---

[70] Hill, 62 F.3d at 482.

[71] 11/27/2001 Trial Tr. 75.

[72] 4/26/2011 Hr'g Tr. 55.

[73] 4/26/2011 Hr'g Tr. 56.

17

Given the prosecutor's understandable inability to remember additional details from a trial held years earlier, the Court must analyze the reason stated at the time. Although "the way a juror looks" may in some circumstances be a sufficient, race-neutral reason for exercising a preemptory strike, it is not sufficient here. In each relevant case cited in the R&R, there are subtle explanations about the way a juror looked or was looking at the prosecutor that supported a finding that "the way the juror looked" was a race-neutral explanation for striking the juror. For example, the juror looked as if she "did not want to be here,"[74] or the juror had not "crack[ed] a smile" or chatted with other jurors, and stared at the prosecutor.[75] In each case, the prosecutor identified something specific about the way the juror looked that provided a race neutral reason for the strike. Such record information is lacking here. Further, in the cases cited, those courts reach their conclusions by deferring to the trial court's findings under ADEPA.[76] We do not so defer here. Thus, while the Court recognizes that a prosecutor's intuition based on the way a juror looks or his demeanor *may* provide a race neutral justification, the prosecutor's inability to articulate any specific element of Juror No. 1's appearance or demeanor that led to the strike leaves the Court with nothing more than a "nebulous expression[] of discomfort" that suggests that the reason given was pretextual.[77]

The record contains further evidence of pretext. The Court agrees with the R&R that based on the limited information contained in the prosecutor's notes about deliberations in the first trial, the prosecutor "would have no basis to assume that in a second trial [Black] jurors

---

[74] Bond, 539 F.3d at 265.

[75] United States v. Alston, 380 F. App'x 217, 220 (3d Cir. 2010).

[76] Bond, 539 F.3d at 263-65.

[77] Coombs, 616 F.3d at 264.

18

would be incapable of rendering a fair and impartial verdict."[78]  However, the notes do suggest, particularly when considered together with defense counsel's affidavit and testimony (which the Magistrate Judge "assumed" to be correct given the lack of evidence to the contrary),[79] that the prosecutor was thinking about jury deliberations as dividing along "racial lines."[80]  The prosecutor was unable to provide any explanation for this notation, and it supports the likelihood that the prosecutor was motivated by "subliminal bias" prohibited by Batson.[81]

Further, the Court disagrees with the finding in the R&R that statistical analysis supports the conclusion that the prosecutor's decision was race-neutral.  To the contrary, the prosecutor exercised five of his six strikes to exclude Black *venire* persons.  Even though the final composition of the jury was 25% Black (from a panel which was 33% Black), this 83% strike rate is suggestive of discriminatory intent.

Finally, considering White *venire* comparators whom the prosecutor did not strike supports a finding of discriminatory intent.  The prosecutor suggested that a juror's failure to answer yes to any questions may support the exercise of a strike against him.[82]  There were two questions on the jury questionnaire that Juror No. 1 answered in the affirmative: that he was either disabled or taking medication and that he had been a juror before.[83]  There were several White jurors who answered "yes" to fewer questions whom the prosecutor did not strike.  For example, Juror No. 8, a White man, answered yes only to his having served on a jury before.  He

---

[78] R&R ¶ 31.

[79] R&R ¶ 27

[80] Pet'r's Ex. 5.

[81] Coombs, 616 F.3d at 264.

[82] 4/26/2011 Hr'g Tr. at 56; 11/27/2001 Trial Tr. 75.

[83] Pet'r's Ex. 7.

19

was selected to serve on the jury at Petitioner's trial. The prosecutor's failure to strike White jurors for the additional reasons cited for striking Juror No. 1 raises an inference of discrimination particularly where, as here, the prosecutor did not exercise all seven of his preemptory strikes.

The prosecutor's reasons are simply insufficient in light of the totality of the circumstances in this case, even accepting the credibility determination of the Magistrate Judge.

## IV. CONCLUSION

For the foregoing reasons, the Court finds that Petitioner has proven that it is more likely than not that the prosecutor struck Juror No. 1 because of race. The Court does not reach this conclusion lightly, but it is the only conclusion that can be drawn after conducting the "difficult and subtle inquiry" mandated by the Third Circuit. Any other conclusion would render Batson's protection meaningless in this case.

Accordingly, the Court will sustain Petitioner's Objections to the R&R and grant the Petition. Petitioner's conviction and sentence for robbery and possessing an instrument of crime will be vacated and set aside and the Court will issue a conditional writ of habeas corpus directing the Commonwealth of Pennsylvania either to release or retry Petitioner within 180 days.[84]

An appropriate Order follows.

---

[84] The Court makes no decision regarding a Certificate of Appealability because Petitioner has not challenged the R&R's finding with respect to the strikes exercised against Juror Nos. 4, 14, 19, and 22, and Respondent does not need a COA to challenge the Court's finding with respect to Juror No. 1. See Wilson v. Beard, 589 F.3d 651, 657 (3d Cir. 2009); see generally 28 U.S.C. 2253; Slack v. McDaniel, 529 U.S. 473 (2000).